*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0412p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

KATHLEEN MARTIN,

*Plaintiff-Appellant,*

*v.*

No. 07-3724

TOLEDO CARDIOLOGY CONSULTANTS, INC.,

*Defendant-Appellee.*

>

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 05-07374—David A. Katz, District Judge.

Argued: June 10, 2008

Decided and Filed: November 21, 2008

Before: MARTIN and BATCHELDER, Circuit Judges; JORDAN, District Judge.[*]

---

## COUNSEL

**ARGUED:** Kimberly A. Conklin, KERGER & HARTMAN, Toledo, Ohio, for Appellant. Timothy C. McCarthy, SHUMAKER, LOOP & KENDRICK, Toledo, Ohio, for Appellee. **ON BRIEF:** Kimberly A. Conklin, Richard Marvin Kerger, KERGER & HARTMAN, Toledo, Ohio, for Appellant. Timothy C. McCarthy, SHUMAKER, LOOP & KENDRICK, Toledo, Ohio, for Appellee.

JORDAN, D. J., delivered the opinion of the court, in which MARTIN, J., joined. BATCHELDER, J. (pp. 10-12), delivered a separate dissenting opinion.

---

## OPINION

---

LEON JORDAN, District Judge. Plaintiff, Kathleen Martin, a former employee with defendant, Toledo Cardiology Consultants, Inc. ("Toledo Cardiology"), brought suit under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a). The district court granted summary judgment in favor of defendant on all claims, and dismissed the case in its entirety. For the reasons that follow, we REVERSE the district court's decision and REMAND.

---

[*]The Honorable R. Leon Jordan, United States District Judge for the Eastern District of Tennessee, sitting by designation.

# I. BACKGROUND

Plaintiff was hired by Toledo Cardiology's corporate predecessor on November 15, 1967, at the age of 19. Originally hired as a medical assistant, plaintiff's duties changed over the years, and eventually she assumed responsibility for drawing blood in the in-house laboratory. Even after becoming a lab technician, plaintiff still maintained other office duties, which according to plaintiff included phone triage with patients; prescription refill phone calls from patients; oversight of the Coumadin program; and oversight of the indigent program.

Dr. Thomas Welch was the CEO for Toledo Cardiology for 22 years. At some point at the end of 2003 or early 2004, Dr. Ameer Kabour became the CEO and assumed control of the daily management of the practice. Dr. Kabour began making administrative and cost-cutting changes, which included inquiries into employee salaries.

In March 2004, Dr. Kabour questioned office manager Sue Moore, age 44, about the salary of Diane Sobota, age 49. Sobota was hired in December 2003 with 10 years of medical office experience to be the office coordinator for one of the satellite offices. Sobota was working at the front desk at the Woodley Road office and was receiving $16.00 per hour, $3.00 per hour too much in Dr. Kabour's opinion. He later ordered her hourly rate reduced and demoted her to a billing department position. She was replaced by Kelly Pratt, a younger employee. Sobota later resigned.

In April 2004, Dr. Kabour confronted plaintiff about using the office Federal Express account for personal use. She explained that she had paid for the service. Dr. Kabour announced that employees were not to use the Federal Express account, and plaintiff did not use it again. Sue Moore testified in deposition that several employees used the Federal Express account and reimbursed the practice. She testified that employees also bought supplies from medical accounts and used postage and then reimbursed the practice.

During the March/April 2004 time period the in-house laboratory was a financial concern. Dr. Kabour asked for lab procedure, billing, and budget information. It was apparent that the lab was losing money, and there were discussions about closing it.

Also about this time Dr. Kabour instituted a new management arrangement involving the use of team leaders. He took most of the duties assigned to office manager Moore and gave them to team leaders. All but one of the new team leaders was on Dr. Kabour's list of favorite employees as identified by Moore. Moore testified that in 2003 she received an email from Dr. Kabour identifying certain employees who were his favorites and stating that he would not be questioned about how he treated these employees or what he did for them. All of these favored employees were younger, under age 40. As a result of the reorganization, Moore was made a billing leader, and her salary was cut 25-30%. Moore testified that she resigned in May 2004 before the salary cut went into effect.

On May 4, 2004, Dr. Kabour called plaintiff into his office and told her that he was upset because she had not apologized for using the Federal Express account and because she had not attended a bridal shower for a co-worker. According to her deposition, plaintiff explained that she had permission to use the Federal Express account and that she was out of town at the time of the bridal shower seeing her mother on Mother's Day.

Dr. Kabour called plaintiff into his office again on September 22, 2004, and told her he had several problems with her. Plaintiff testified that the problems were: 1) use of the Federal Express account; 2) interference with practice management; 3) personal relationships; 4) negative attitude; and 5) salary. As to the salary issue, plaintiff testified that Dr. Kabour told her that she was ungrateful that Toledo Cardiology "allowed" her to work and that he could get "newer people to

work for less." Dr. Kabour told plaintiff her salary would be reduced from $53,400 to $38,000 annually.[1]

After addressing these problems, Dr. Kabour then presented plaintiff with a memorandum written by Dr. Mohammad Alkhateeb, one of the doctors in the practice, describing an incident that allegedly occurred in the lunchroom. Dr. Alkhateeb stated in the memo that he overheard plaintiff make a racial slur about a patient in his presence. Martin testified in her deposition that she denied making the remark and asked to speak to Dr. Alkhateeb, but Dr. Kabour refused and handed her documents regarding the salary reduction and the racial slur. He told her she could sign the documents, quit, or be fired. Dawn Hook, an employee identified as one of Dr. Kabour's favorites by Moore, had submitted a statement saying that she overheard the plaintiff make the racial slur. However, the record also contains a declaration from Kimberly Bachmeyer who described the incident and who said she was with plaintiff at the time. She denied plaintiff made the remark as described by Dawn Hook. Bachmeyer also stated that she was not asked about the incident by Dr. Kabour or by Dr. Alkhateeb, but if she had been asked, she would have stated that plaintiff did not make the remark she was accused of making.

Plaintiff signed the documents. She testified that after the meeting she was under the impression that Dr. Kabour wanted her to quit and that she was on 90-day probation period.

Plaintiff filed her charge of age discrimination with the Ohio Civil Rights Commission ("OCRC") on October 29, 2004. Defendant received the charge on November 9, 2004.

On November 15, 2004, Dr. Kabour met with plaintiff and told her that the lab would be closing December 1, 2004, rather than January 1, 2005, as planned. Beginning January 3, 2005, her duties would be that of a medical assistant and floor tech, an entry level position. Dr. Kabour asked plaintiff if she would take the position, and she told him she needed to discuss it with family over the Thanksgiving weekend. According to Terri Zmuda who witnessed the meeting, plaintiff afterwards stated, "Retaliation is not a good thing." On November 30, 2004, plaintiff told Dr. Welch that she would stay. He testified in deposition that she was angry at the time and may have referred to "taking down" Dr. Kabour. Dr. Welch informed Dr. Kabour that plaintiff intended to stay.

On December 1, 2004, Nurse Marjorie Trevino gave plaintiff two memos written by Dr. Kabour; one dealt with closing the lab and the other announced that the floor-tech schedule for January 3, 2005 would be effective that day. The schedule called for plaintiff to work at Toledo Cardiology's east side location one day a week. According to plaintiff, she made a joke to Trevino that she could get a second job on that side of town so she would not be late. However, Trevino claimed that plaintiff said she had a second job and would not travel to the other offices and said that "if he wants to fire me over that, then so be it," referring to Dr. Kabour. In her deposition, plaintiff denied making this statement.

The events concerning plaintiff's training as a floor tech on the day of her termination differ somewhat as well. Plaintiff did lab closing procedures until Trevino told her to train on the floor. According to Trevino's memo recording the day's events, plaintiff trained briefly on the floor in the morning until Dr. Kabour had an emergency. Trevino testified in deposition that as soon as Dr. Kabour left the office, plaintiff went back to the lab. Plaintiff testified that once all the patients were in the exam rooms, she went back to the lab to return phone calls to patients.

---

[1]The record indicates that while Sobota, Moore, and plaintiff experienced salary reductions, all other employees, including the younger employees, received salary increases in 2004. Bonuses for management employees were cut.

The Trevino memo also refers to a remark made by plaintiff in response to Trevino about the need to complete certain things in the lab. Plaintiff allegedly responded, "I am sorry I can't help you, babe." Trevino claims plaintiff refused to tell her what was going on with the patients. Plaintiff explained the remark in her deposition to mean that she could not stay and help Trevino go through all the charts on the desk. According to plaintiff's deposition testimony, that day she was doing everything she could to save her job.

While plaintiff was back in the lab, she drafted a letter to Dr. Kabour, Dr. Welch, and Nurse Trevino asking to keep other job duties and be considered for secondary floor help as needed. The letter stated:

> The purpose of any medical office is to provide the best medical care possible by utilizing the skills of its employees to their fullest.
>
> Most, if not all, of TCC's employees have been trained in specific areas and have become proficient in those areas.
>
> Since my areas with the exception of phlebotomy and in house testing are still needed services, I would ask that I continue to perform those tasks and be considered secondary floor help if needed.
>
> Other areas where my experience would prove beneficial would be handling RX refills, phone triage, and most importantly lab test follow-up. This last would at least provide the patient with some continuity of care.

Plaintiff gave the letter to Trevino to distribute. Trevino reported in her memo recording the day's events that plaintiff told her she was advised by her attorney to write the letter. However, plaintiff testified in her deposition that she did not have an attorney at the time.

After Dr. Kabour returned and had been informed by Trevino about the morning's events, Dr. Kabour called plaintiff into his office. According to plaintiff, he told her that he was very upset about the letter and that he could not work with her anymore. He told her he considered her actions blackmail and briefly referenced her filing of the OCRC charge. He terminated her and said she would be given two weeks' severance pay.

Dr. Kabour testified that the letter was one reason why he fired the plaintiff. He found the letter insulting and considered it an attempt by the plaintiff to tell him how to run the practice and take care of patients.

Dr. Welch testified that in his 22 years as CEO of Toledo Cardiology he had no recollection of having to discipline plaintiff. In fact, plaintiff's record indicates that in 37 years of employment, she had no prior disciplinary incidents.

## II. STANDARD OF REVIEW

This court reviews *de novo* a district court's grant of summary judgment. *Johnson v. Econ. Dev. Corp.*, 241 F.3d 501, 509 (6th Cir. 2001). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A 'genuine issue of material fact' is one which, if proven at trial, would result in a reasonable jury finding for the non-moving party." *Doren v. Battle Creek Health Sys.*, 187 F.3d 595, 597 (6th Cir. 1999) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). In order to

defeat a motion for summary judgment, the non-moving party must present probative evidence that supports the complaint. *Liberty Lobby*, 477 U.S. at 249-50. The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id.* at 255. Ultimately, the court must determine whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52. However, "the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* at 249.

## III. ANALYSIS

### A. ADEA Claim

The ADEA prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). An employee can establish an age discrimination case by either direct or circumstantial evidence. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). At oral argument, plaintiff's counsel announced that she had abandoned the issue of whether there is direct evidence to support her age discrimination claim. Thus, plaintiff's age discrimination claim is analyzed based solely on circumstantial evidence.

Circumstantial evidence may be used to establish an age discrimination case under the *McDonnell Douglas* burden shifting framework. *Id.* To establish a prima facie case of age discrimination under this analysis, the plaintiff must show that 1) she was a member of the protected class, 2) she was subject to an adverse employment action, 3) she was qualified for the position, and 4) she was replaced by someone outside the protected class. *Id.* at 349. Plaintiff can satisfy the fourth prong of the prima facie case by showing that she "was treated differently from similarly situated employees outside the protected class." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment action. *Kline*, 128 F.3d at 342. Once the defendant meets this burden, "the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994).

In this case, the district court granted summary judgment to defendant because plaintiff could not meet the prima facie showing. The district court determined that because she could not demonstrate that she was treated differently than similarly-situated individuals outside the protected class, plaintiff could not establish a prima facie case of age discrimination. Thus, with plaintiff's age discrimination claim, the district court ended its analysis at the prima facie stage and did not reach the legitimate reasons or pretext portions of the *McDonnell Douglas* analysis.

In finding that the plaintiff could not establish that she was similarly situated to younger employees in the office, the district court relied on *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992) in which we stated that:

> to be deemed "similarly-situated[,"] the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

The district court then held:

If Plaintiff Martin were able to point to one non-protected employee whose salary was not reduced and who was not fired, and who also used flagrantly offensive ethnic slurs in the workplace and, in the judgment of the TCC partners, was overpaid and interfered with personal and personnel issues in the workplace, then this argument might have been worth further discussion.

Plaintiff argues that this standard as articulated by the district court is impossibly rigid and not required by the law of the circuit.

Initially, however, we address the fact that the district court inappropriately made factual findings regarding material matters that are in dispute and incorporated them in the similarly-situated standard. The court obviously accepted as true and completely relied on the defendant's version of the racial slur incident. However, the circumstances surrounding this event are clearly in dispute. Plaintiff denied in her deposition that she made the racial slur. The record contains a declaration from a co-worker, Kimberly Bachmeyer, who was sitting at the table with plaintiff at the time the alleged incident occurred, and in that declaration Bachmeyer denies the remark was made as asserted by Dr. Alkhateeb and Dr. Kabour. Plaintiff explained in her deposition that when she was confronted by Dr. Kabour about the incident, he presented her with documents that she could sign, quit, or be fired. Plaintiff testified that she was single and helping to support her mother, so she needed the job. She signed the papers. However, in them she does not admit to making the specific ethnic slur. This was the first time in the 37 years of employment that plaintiff had been disciplined. Clearly, this was a decisive event; yet the district court does not reference the plaintiff's deposition testimony or the co-worker's declaration. Rather, the district court accepted completely the defendant's version of the facts and made a factual finding inappropriate for summary judgment. Incorporating this factual finding into the similarly- situated standard for plaintiff's prima facie case showing was also inappropriate.

To satisfy the similarly-situated requirement, a plaintiff must demonstrate that the comparable employee is similar "in all of the *relevant* aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (italics in original). This Court stated in *Ercegovich*:

> The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly-situated;" rather, as this court has held in *Pierce* [*v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)], the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in "all of the *relevant* aspects."

*Id.* (citation and footnote omitted).

The district court's framing of the similarly-situated standard is too narrow and necessitates an exact correlation not required by the law of this circuit. The prima facie showing is not intended to be onerous. *See Jackson v. Fedex Corp. Servs., Inc.* 518 F.3d 388, 396 (6th Cir. 2008). Yet the district court's overly narrow and restrictive definition of similarly situated made it virtually impossible for plaintiff to make a prima facie showing. Plaintiff submitted evidence of alleged disparate treatment in the disciplinary context and in the context of her pay reduction. This evidence may have been sufficient to establish a prima facie case of age discrimination if an appropriately framed similarly-situated standard had been articulated by the district court.

In addressing the plaintiff's prima facie age discrimination case, the district court impermissibly made factual determinations and improperly drew inferences in favor solely of the defendant. The factual findings were then incorporated into a similarly-situated standard that was too narrowly framed based on the law in this circuit. Therefore, plaintiff's prima facie case of age

discrimination was not properly analyzed, and summary judgment should not have been granted to defendant.

## B. Retaliation Claim

The *McDonnell Douglas* burden-shifting framework also applies to retaliation claims. *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 713 (6th Cir. 2007) (citing *Dixon v. Gonzales*, 481 F.3d. 324, 333 (6th Cir. 2007)). To make out a prima facie case of retaliation, a plaintiff must establish that: (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took an adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 552-53 (6th Cir. 2002).

Once the plaintiff has made out a prima facie case, the burden of production shifts to the employer to proffer a legitimate, nondiscriminatory reason for its actions. *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008) (citing *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 862 (6th Cir. 1997)). If the employer meets this burden, the burden then shifts to the plaintiff to demonstrate by a preponderance of evidence that the legitimate reason given by the employer was a pretext for retaliation. *Id.* (citing *Avery Dennison*, 104 F.3d at 862). In order to establish pretext, a plaintiff must demonstrate that (1) the proffered reason had no basis in fact; (2) the proffered reason did not actually motivate plaintiff's termination; or (3) the proffered reason was insufficient to motivate plaintiff's discharge. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

With regard to the retaliation claim, the district court briefly summarized the parties' arguments and then concluded:

> [E]ven if a prima facie case exists based on timing alone, Defendant may rebut the case by showing legitimate, non-discriminatory reasons for the firing. Those reasons have been discussed extensively above. Specifically, her personality conflicts with other employees and TCC partners, her apparent unwillingness to go along with many parts of the restructuring process at TCC, and, last but not by any means least, her flagrant use of derogatory language that was offensive to both patients and her employers, all constitute legitimate, non-discriminatory reasons for her firing. Further, Martin is unable to establish that these reasons were pretextual because, as is clear from the above discussion, they (1) had a real basis in fact, (2) were sufficient motivation for the firing, and (3) have not been shown not actually to have motivated Plaintiff's demotion or firing.

The district court offered no further discussion. We find that as with the prima facie showing in the age discrimination case, the district court impermissibly made factual findings and did not view the evidence in the light most favorable to the plaintiff, the non-moving party.

The district court concluded that plaintiff could not show that the non-discriminatory reasons offered for her firing were pretextual. However, the district court did not consider plaintiff's evidence. As previously discussed, there are material issues of fact concerning the racial slur incident that would call into question relying on that as a justification for firing the plaintiff, making summary judgment on that basis inappropriate. In addition, the district court concluded that plaintiff could not show that her personality conflicts and unwillingness to go along with the restructuring of the practice were pretextual. However, the court did not consider evidence offered by the plaintiff that would counter these conclusions or cast them in a different light. Dr. Kabour, for example, had singled out a specific younger group of employees for special treatment. He demoted and reduced the salary of Sobota, age 49, who later resigned. He took the responsibilities from office manager

Moore, age 44, and gave them to his younger favored employees and reduced her salary. Moore resigned before the salary reduction went into effect. Plaintiff, who in 37 years of employment had not had any disciplinary action taken against her, was reprimanded for using the Federal Express account and not attending a wedding shower. The record reflects that other employees used the account and reimbursed the practice as did plaintiff; yet Dr. Kabour revisited that issue in his May 2004 meeting with plaintiff when he told her he was upset because she had not apologized for using the account.

Additionally, there are material issues of fact surrounding the circumstances of plaintiff's termination. In her deposition, plaintiff disputed much of how Trevino described the events of the morning of December 1, 2004. Trevino noted and reported to Dr. Kabour that plaintiff refused to go to any satellite office because she had a second job and if Dr. Kabour wanted to fire her for that then "so be it." This was a significant fact because Dr. Welch testified that plaintiff was terminated because she refused to go to the Oregon office location. However, plaintiff testified in her deposition that she did not have a second job and that she only made a joke about getting a second job on the side of town where she was scheduled to go. Plaintiff also denied making the statement about refusing to go to the satellite office even if it would mean dismissal. As to the letters plaintiff wrote to the doctors and asked Trevino to deliver, she denied that she had an attorney at the time. Thus, plaintiff had put at issue Trevino's statement that the letters were written on the advice of her attorney. This fact was significant to Dr. Kabour who was very upset by the letter, which was a factor in plaintiff's termination. These factual issues, combined with the close temporal proximity of the filing of plaintiff's OCRC charge to her termination, make summary judgment inappropriate.

The facts recited above do not themselves establish discrimination. However, if the inferences are properly drawn in favor of the plaintiff, a reasonable jury could find that they suggest pretext. Viewing the record as a whole and taking the proof in the light most favorable to the plaintiff, a jury could infer that Dr. Kabour favored younger employees and sought to rid the practice of its older employees. Based on plaintiff's proof, which the district court rejected, a jury could infer that when plaintiff filed her OCRC charge and refused to quit, Dr. Kabour terminated her. There is sufficient evidence in the record to find that plaintiff should have been given the opportunity to present her case of pretext to a jury. We conclude that the district court impermissibly made factual determinations and drew inferences that should have been made by a jury.

Defendant argues, however, that it is entitled to summary judgment based on the "honest belief rule." This requires the plaintiff to demonstrate that the employer did not "'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001) (citing *Smith v. Chrysler*, 155 F.3d 799, 806-07 (6th Cir. 1998)).

> In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.

*Smith*, 155 F.3d at 807.

The events involving plaintiff's termination unfolded quickly on December 1, 2004. Dr. Kabour fired plaintiff shortly after he received her letter. According to plaintiff's testimony, she "didn't have a chance to say much of anything." He told her he considered her actions blackmail and briefly referenced her OCRC charge. While Dr. Kabour testified that the reasons for plaintiff's termination were the letter or her refusal to do her job, plaintiff's evidence regarding Dr. Kabour's

comments at the termination meeting put those reasons in doubt.  Plaintiff has produced sufficient evidence to place at issue whether Dr. Kabour made a reasonably informed and considered decision before terminating her.

In addition, to the extent the racial slur was a factor in plaintiff's firing, there is a material issue whether a reasonable and informed decision was made.  Although time had passed since that incident, there is a question how reasonable and thorough the inquiry had been.  The Bachmeyer declaration reflects that even though she was sitting with the plaintiff at the time the incident allegedly occurred, no one from Toledo Cardiology approached her about what she heard or observed.  However, Dr. Kabour did rely on the statement of Dawn Hook, one of his young favored employees, who maintained that plaintiff made the racial slur.  A reasonable jury could infer from these facts that defendant did not make a reasonably informed and considered decision before terminating plaintiff on this basis.

## IV. CONCLUSION

Because we find that there are material issues of fact concerning Martin's ADEA and Title VII claims, we REVERSE the district court's granting of summary judgment and REMAND for further proceedings consistent with this opinion.

---
**DISSENT**
---

ALICE M. BATCHELDER, Circuit Judge, dissenting. I disagree with the majority's characterization of the fact question at issue, as well as what I view as misapplication of the "honest-belief rule" and its needless and unfair criticism of the district court judge. I respectfully dissent.

**I.**

Dr. Mohammed Alkhateeb, a Toledo Cardiology employee, presented a signed a memo to Dr. Ameer Kabour, Toledo Cardiology's CEO, in which he claimed to have overheard Kathleen Martin (the plaintiff in this case) make an ethnic slur during a conversation with another employee in the company break room. Yet another employee, Dawn Hook, confirmed this incident for Dr. Kabour, explaining that Ms. Martin had said that a patient had "smelled like camel shit, like one of those damn Arabs." Dr. Kabour confronted Ms. Martin with this accusation and, although she protested that she had been misunderstood, she signed a form admitting to the slur and acknowledging the company's zero-tolerance policy. It bears emphasizing that, although she has since insisted that she never actually said the slur, she signed the admission at the time.

The majority criticizes the district court, repeatedly, on the basis that a material question of fact remained in dispute; that question being whether Ms. Martin actually said the slur, and the dispute being that Ms. Martin contends that she did not. But, the question before us is not whether she actually said the slur — she admitted to Dr. Kabour at the time that she said the slur and even signed an admission. The question, for purposes of her discrimination/retaliation claim, is whether Dr. Kabour, at the time he imposed the discipline, *reasonably or legitimately believed* that she said the slur and, in a telling passage from his deposition, Dr. Kabour insists that he did:

> I have to say about this statement here [by] Dr. Alkhateeb, who is very gentleman and very straight-forward and very honest guy, and I give him a lot of respect. And when some gentleman like that come[s] in and is very disturbed about a statement made in front of him, and wasn't really pa[ying] attention — that he was just crossing [through the break room] . . . when the statement was made, you know, I have to believe every word he's telling me, because I trust the guy. I have to say that.

When questioned about his investigation into the accusation, Dr. Kabour explained that he questioned other employees about the incident, to which: "Teri Trimmer did not recall. Kim Bochmeyer, she did not confirm or disconfirm the incident. Dawn Hook confirmed the incident." When questioned about his confrontation of Ms. Martin, Dr. Kabour explained:

[Martin's Attorney]:   So how did the meeting come about that you had with Kathy Martin regarding the remark?

[Dr. Kabour]:   She was called into my office and she was asked about the incident. And she never denied it, but she said that probably she was misunderstood.

. . .

[Martin's Attorney]:   Did she admit saying that a patient 'smelled like an Arab'?

[Dr. Kabour]:          She did not comment on that, and I did not ask that question. I asked her specific question: 'Did you make a statement' — which is related to that subject as written here by Dr. Alkhateeb — 'smells like an Arab'?

[S]he said she does not think she made that kind of statement. Probably she was misunderstood.

. . .

[Martin's Attorney]:          Okay[,] . . . what would you have done if Kathy Martin would have said, 'I absolutely did not make that statement'?

[Dr. Kabour]:          At that time[,] I'm going to get all the witnesses which I heard [] were involved, se[at] them around the table, and we'll see who is [a] liar.

But, because Ms. Martin did not deny making the slur, clearly and unequivocally, and instead signed the admission statement, Dr. Kabour did not gather the witnesses to "see who is [a] liar."

## II.

The majority reverses the district court's grant of summary judgment to the defendant and, as justification for its decision, accuses the district court, repeatedly, of making a finding of fact (in favor of the defendant) on a genuine question of material fact, which is clearly beyond the bounds of the district court's authority when deciding a summary judgment motion. But, the majority's question of fact — whether Ms. Martin actually uttered the offensive slur — is not material; it is inconsequential at this point in time and as an aspect of this particular legal claim. The pertinent consideration is whether Dr. Kabour "honestly believed" the proffered non-discriminatory reason for his action, *see Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001); i.e., whether Dr. Kabour honestly believed that Ms. Martin had uttered the slur, based on "a reasonably informed and considered decision," *see Smith v. Chrysler*, 155 F.3d 799, 807 (6th Cir. 1998).

At her deposition, Ms. Martin testified to her memory of the confrontation as follows:

[Dr. Kabour] handed me the memo [documenting the accusation], and I said I didn't say that. I said I want to talk to Dr. Alkhateeb, and [Dr. Kabour] said he thought [that] it would be advisable if I did[,] but I needed to sign the papers first [meaning the papers admitting to saying the slur].

And I just - - I said [to Dr. Kabour at the time], you know, I wouldn't have said something like that. I said, You know me. I said, That's not who I am, and he really wasn't open to discussion about it.

Nothing in her testimony suggests that Dr. Kabour did not honestly believe that she had uttered the slur. In fact, her testimony demonstrates as compellingly as his that he was fully convinced. She has not put this question of fact — whether Dr. Kabour *believed* she said it — into dispute.

The majority rejects the honest-belief rule on the assertion that "there is a question [of] how reasonable and thorough the inquiry [into the slur] had been" and, as its basis for doing so, relies on a "declaration" by Kimberly Bachmeyer to the effect that Ms. Martin did not utter the slur and that Dr. Kabour never actually inquired of Ms. Bachmeyer about it. But this "declaration" is not an affidavit — it is not notarized or authenticated (it is not even actually signed, containing just an "/s"

typed signature) — and, therefore, it is not admissible on summary judgment, *see* Fed. R. Civ. P. 56(e), as the majority certainly knows. So, reliance on this "declaration" is wholly improper.

Dr. Kabour testified at his deposition that he had received a written and signed accusation from Dr. Alkhateeb, whom he trusted; had inquired of three possible witnesses; and had confronted Ms. Martin herself. In addition to Dr. Kabour's deposition, the record contains depositions by Dr. Alkhateeb and Ms. Hook, among others — though, notably, not Ms. Bachmeyer. Dr. Alkhateeb testified to his hearing Ms. Martin say the slur, reporting it to Dr. Kabour, and preparing and signing the written accusation to document the incident. Dr. Alkhateeb also testified that Ms. Martin had approached him later and apologized. Ms. Hook testified unequivocally that she had heard Ms. Martin say the slur, though Ms. Hook was not questioned about the ensuing investigation.

### III.

There is no basis to conclude, as the majority does, that Dr. Kabour's inquiry was not reasonable or thorough, or that Dr. Kabour's belief that Ms. Martin uttered the offensive slur was not honestly held. I would affirm the judgment of the district court.