**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0572n.06

No. 10-5795

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Jun 05, 2012**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| JOHN R. BLANDFORD, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| EXXON MOBIL CORPORATION d/b/a | ) | EASTERN DISTRICT OF TENNESSEE |
| EXXON MOBIL FUELS MARKETING | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

Before:  GIBBONS and SUTTON, Circuit Judges; DUGGAN, District Judge.[*]

DUGGAN, District Judge.  In this suit, Plaintiff John Blandford asserts claims of age

discrimination under the Age Discrimination in Employment Act ("ADEA") and the Tennessee

Human Rights Act ("THRA") against his employer, Exxon Mobil Corporation  ("ExxonMobil").

Blandford appeals the district court's grant of summary judgment in favor of ExxonMobil with

respect to his claims.  For the reasons set forth below, we affirm the district court's decision.

I.

ExxonMobil sales representatives are known within the company as "Territory Managers"

("TMs").  The general class of TMs can be further subdivided based on the type of customers served.

Two groups of TMs that are particularly relevant to this suit are those who service "Company

---

[*]The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of
Michigan, sitting by designation.

Operated Retail Stores" ("CORS TMs") and those who service independent distributors of ExxonMobil products ("Distributor TMs"). The company has typically assigned new recruits and recent college graduates to the CORS TM position to allow them to learn the business. R. 49-1 at 29-30. As these employees gain experience, they often become Distributor TMs. Appellant App'x 53. At all times relevant to this litigation, Blandford was employed as a Distributor TM.

ExxonMobil considers several factors in determining employees' compensation: the employee's (1) "classification level" ("CL"); (2) performance, represented by a Rank Group Percentile; and (3) work experience, measured in years. R. 25 at ¶¶ 3-4. Each CL corresponds to a minimum and maximum salary. The Rank Group Percentile and work experience values are used to define a number of "salary reference curves" within each CL. *Id.* at ¶ 4. The curves are defined so that compensation rises at a decreasing rate as the employee gains experience. Thus, the trajectory of the salary curve "flattens out." *See* Appellee App'x 179. ExxonMobil has also at times created salary curves for specific positions based on surveys of competitive data. R. 25 at ¶ 5. These salary curves follow the same basic trajectory, with compensation rising at a decreasing rate.

By January 2003, ExxonMobil perceived a need to align the pay of the TM job family more closely with the pay offered in the marketplace for comparable positions. To accomplish this, the company conducted internal studies and gathered competitive data from consulting organizations William A. Mercer, Inc. and Towers Perrin. *Id.* at ¶ 6. Through these efforts, the company determined that the pay structure of the TM job family was not aligned with the market. Appellee App'x 193. ExxonMobil defined a new salary structure for the TM job family, which became known

as the "TM Salary Curve." *Id.* at ¶ 8. The decision was made to apply the TM Salary Curve to a number of positions, including the CORS TM and Distributor TM positions. Appellee App'x 420.

The TM Salary Curve was implemented in January 2003. *Id.* As a part of this change, positions in the TM job family were given a new CL with a salary range of $45,000 through $77,000. At the time, many TMs, including Blandford, had salaries above the $77,000 target maximum. R. 25 at ¶ 10-11. ExxonMobil implemented a program called "merit transition," where TMs with salaries above the target maximum would obtain annual "merit transition increases" of $800 to $1,200. *Id.* at ¶ 14. The merit transition increase was expected to be smaller than the merit raises given to TMs whose salaries were below the maximum level. Appellant App'x 33. Because the salary ranges for each CL tended to increase from year to year, the result was that the salaries of all TMs would eventually fall within the minimum and maximum range of the TM Salary Curve. Following the implementation of the TM Salary Curve, Blandford was given annual merit transition increases of between $800 and $1,200. R. 49-5.

In August 2006, ExxonMobil conducted a "TM job family evaluation workshop" attended by several executives of the Fuels Marketing organization. The workshop's purpose was to review the application of the TM Salary Curve. Human Resources executive Benjamin Buckland served as the workshop's facilitator. Workshop attendees evaluated and compared the positions subject to the TM Salary Curve to determine whether changes should be made. After this discussion, the executives recommended the removal of several positions from the TM Salary Curve, but not the Distributor TM position. Appellee App'x 434.

At some point, Blandford raised a concern that the TM Salary Curve was discriminatory based on age. In October 2006, Blandford participated in a conference call with Buckland, Area Manager Jim Coleman, and Distributor Business Manager Kendall MacGibbon to discuss this issue. R. 44-2 at 15. Blandford was told that his concerns were investigated, but that no discrimination was found. *Id.* at 16. During this phone call, Buckland allegedly stated, "intuitively . . . we all know that the value of experience goes down with age." R. 44-1 at 15.

In August 2008, Blandford filed his complaint in the Circuit Court of Knox County, Tennessee, alleging age discrimination under the ADEA and THRA. ExxonMobil removed the case to the Eastern District of Tennessee and moved for summary judgment. The district court granted ExxonMobil's motion in an opinion dated June 3, 2010. Blandford now appeals that decision.

II.

A district court's grant of summary judgment is reviewed *de novo*. *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of proving the absence of a genuine issue of material fact and its entitlement to summary judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All facts, including inferences, are viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central inquiry is "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

III.

"The ADEA prohibits an employer from failing or refusing to hire, discharging, or discriminating 'against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . .'" *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009) (quoting 29 U.S.C. § 623(a)(1)). "A plaintiff may establish a violation of the ADEA by either direct or circumstantial evidence." *Id.* (citing *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008)). "'Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Id.* (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc)). "'Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred.'" *Id.* (quoting *Wexler*, 317 F.3d at 570). "Regardless of the type of evidence submitted, the burden of persuasion remains on ADEA plaintiffs to demonstrate 'that age was the but-for cause of their employer's adverse action.'" *Provenzano*, 663 F.3d at 811 (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 178 n.4 (2009)). Age discrimination claims brought under the THRA are evaluated using the same analysis. *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 620 (6th Cir. 2006).

A. Disparate Treatment Claim

"The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 153 (2000). In an age discrimination case, this means that the plaintiff's age "must have 'actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome.'" *Id.* at 141 (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)) (alteration in original).

1. Direct Evidence

Blandford argues that Buckland's statement, "intuitively . . . we all know that the value of experience goes down with age," R. 44-1 at 15, is direct evidence of age discrimination. When examining statements allegedly showing employer bias on the basis of age, courts should consider "whether the comments were made by a decision maker or by an agent within the scope of his employment; whether they were related to the decision-making process; whether they were more than merely vague, ambiguous, or isolated remarks; and whether they were proximate in time" to the challenged action. *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994).

It is undisputed that Buckland was involved in neither the design nor the initial implementation of the TM Salary Curve. Blandford argues that Buckland's comment is significant, however, because Buckland facilitated the 2006 workshop at which ExxonMobil executives decided not to remove the Distributor TM position from the TM Salary Curve. Blandford thus concludes that Buckland has a "connection to the decision-making process." Appellant Br. 29. This "connection" is tenuous at best. Buckland may have had access to the decision makers, but there is no evidence

indicating that he influenced their decision in any meaningful way. There is also no evidence suggesting that these decision makers shared Buckland's views with respect to age and experience.

Buckland's remark also does not reflect a discriminatory attitude toward older workers, as Blandford suggests. By stating that "the value of experience goes down with age," Buckland merely expressed the view that experience is subject to diminishing returns. Put differently, an employee can be expected to gain much of the knowledge necessary to his position early in his assignment. Once the employee has developed considerable expertise, each additional year of experience makes less of a difference. This does not imply that older TMs are any less capable of performing their jobs; in fact, it seems to suggest the opposite. The premise for the diminishing return is that more experienced employees have already established expertise in their jobs, while less experienced employees are still developing their skills. This assumption appears to be one of the foundations of ExxonMobil's general compensation system, as its salary reference curves tend to flatten out as experience increases. *See* Appellee App'x 179. Blandford testified that he does not believe that the general compensation system was discriminatory based on age. R. 26-1 at 5. It is difficult, if not impossible, to reconcile this position with Blandford's assertion that Buckland's remark was facially discriminatory. Buckland's remark was ambiguous at worst, and certainly does not require the conclusion that unlawful discrimination motivated ExxonMobil's decision. The district court correctly concluded that Blandford failed to present direct evidence of age discrimination.

No. 10-5795
*Blandford v. Exxon Mobil Corp.*

2. Circumstantial Evidence

"The three-step framework developed in *McDonnell Douglas Corp. v. Green* and modified by *Texas Dep't of Community Affairs v. Burdine* guides the analysis of age discrimination claims based upon circumstantial evidence." *Provenzano*, 663 F.3d at 811-12 (citations omitted). "In the first step, the employee carries the initial burden of establishing a prima facie case of age discrimination; if the employee meets this burden, the second step requires the employer to respond by articulating some legitimate, nondiscriminatory reason for the adverse employment action at issue." *Id.* at 812 (citing *McDonnell Douglas*, 411 U.S. 792, 802 (1973)). "Third, assuming such a response is made, the employee then bears the burden of rebutting this proffered reason by proving that it was pretext designed to mask discrimination." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804). "At all times, the ultimate burden of persuasion remains on the plaintiff to demonstrate that age was the 'but-for' cause of their employer's adverse action." *Id.* (citing *Burdine*, 450 U.S. 248, 253 (1981)).

Blandford's prima facie case requires him to show that he: (1) is a member of a protected class; (2) was qualified for his position; (3) suffered an adverse employment action; and (4) suffered such action under circumstances giving rise to an inference of unlawful discrimination. *See Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 364-65 (6th Cir. 2007). The district court concluded that Blandford satisfied the first three elements, but not the fourth.

Blandford has presented statistical analysis indicating that older workers are treated less favorably as a result of the TM Salary Curve. "'Appropriate statistical data showing an employer's

pattern of conduct toward a protected class as a group can, if unrebutted, create an inference that a defendant discriminated against individual members of the class.'" *Bender*, 455 F.3d at 622 (quoting *Barnes v. GenCorp., Inc.*, 896 F.2d 1457, 1466 (6th Cir. 1990)) (citation omitted). "'To do so, the statistics must show a significant disparity and eliminate the most common nondiscriminatory explanations for the disparity.'" *Id.* (quoting *Barnes*, 896 F.2d at 1466) (citation omitted). Blandford's analysis shows that Distributor TMs tended to be, on average, older than CORS TMs. This is easily explained, as the CORS TM position was often used to train new recruits and recent college graduates. R. 49-1 at 29-30. Blandford's analysis also establishes that after the implementation of the TM Salary Curve, Distributor TMs' raises were, on average, smaller than those given to CORS TMs. This disparity is not surprising, because the TM Salary Curve limited the raises given to TMs whose salaries were above the maximum of the salary range. According to Blandford, the average Distributor TM's salary in 2001 was $86,600, which was already above the $77,000 target ceiling of the TM Salary Curve. Appellant Br. 12. This presents an obvious explanation for the statistical disparity - the raises given to many Distributor TMs were limited because those employees' salaries were already above the target ceiling. "[T]here is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age," even where the motivating factor is correlated with age. *Hazen Paper Co.*, 507 U.S. at 608-09. Age discrimination plaintiffs must establish that they were discriminated against "because they were old, not because they were expensive." *Allen v. Diebold, Inc.*, 33 F.3d 674, 677 (6th Cir. 1994). Blandford's statistical analysis fails to satisfy this burden.

Blandford points to documents created prior to adoption of the TM Salary Curve in which it was projected that this change would result in significant cost savings for ExxonMobil. This is irrelevant, as "[t]he ADEA was not intended to protect older workers from the often harsh economic realities of common business decisions." *Id.* Blandford also notes that ExxonMobil's pre-implementation analysis included data on the number of employees in various age groups. *See* Appellant App'x 44. Discriminatory intent cannot be implied based solely upon ExxonMobil's awareness of its employees' ages, as it does not necessarily follow that age motivated the company's compensation decisions.

Blandford asserts that the Mercer survey was not the most appropriate benchmark for the TM Salary Curve, and ExxonMobil's decision to rely on this survey is evidence of discriminatory intent. Appellant Br. 49-50. "In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). "[T]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* (citing *Burdine*, 450 U.S. at 256). Before creating the TM Salary Curve, ExxonMobil obtained compensation surveys that contained data from a variety of businesses, including oil and gas companies. R. 25 at ¶ 6-7. ExxonMobil compared its own salaries with those identified in the surveys and designed the TM Salary Curve to conform with competitive benchmarks. *Id.* at ¶ 10. The company also re-evaluated the positions subject to the TM Salary Curve in 2006 to determine whether application of the curve to those positions was appropriate.

Blandford's evidence indicates that ExxonMobil's decision was perhaps unwise and that a more appropriate benchmark could have been found. It does not demonstrate, however, that the decision was so poorly informed as to suggest discriminatory intent.

The district court correctly concluded that Blandford failed to demonstrate an adverse employment action under circumstances giving rise to an inference of unlawful discrimination. He has not established a prima facie case of disparate treatment on the basis of age, and for this reason, summary judgment in ExxonMobil's favor was appropriate.

B. Disparate Impact Claim

"'Claims that stress disparate impact involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another.'" *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 403 (6th Cir. 2008) (quoting *Smith v. City of Jackson*, 544 U.S. 228, 239 (2005)). In *City of Jackson*, the Supreme Court held that ADEA plaintiffs may recover under a disparate impact theory. 544 U.S. at 240. The scope of disparate impact liability under the ADEA is narrower than under Title VII, because "age, unlike race or other classifications protected by Title VII, not uncommonly has relevance to an individual's capacity to engage in certain types of employment." *Id.* at 240. The plaintiff must identify "'specific employment practices that are allegedly responsible for any observed statistical disparities.'" *Id.* at 241 (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656 (1989)). If the plaintiff is able to demonstrate disparate impact, the employer may escape liability by showing that "the differentiation is based on reasonable factors other than age." 29 U.S.C. § 623(f)(1). An employer seeking to defend on this basis "must

not only produce evidence raising the defense, but also persuade the factfinder of its merit."

*Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 87 (2008).

With respect to Blandford's disparate impact claim, the district court concluded that ExxonMobil had demonstrated that its employment practice was based on reasonable factors other than age. Blandford disagrees with this analysis. He argues that ExxonMobil considered and rejected the use of a Senior Territory Manager Salary Curve, despite the fact that the proposed curve would have lessened the impact on older employees. Under the ADEA, the proper inquiry is whether the employer's differentiation based on a factor other than age was reasonable, not whether another course of action would have avoided a disparate impact. *See City of Jackson*, 544 U.S. at 243 ("Unlike the business necessity test, which asks whether there are other ways for the employer to achieve its goals that do not result in a disparate impact on a protected class, the reasonableness inquiry includes no such requirement."). It is therefore irrelevant that ExxonMobil rejected the proposed Senior Territory Manager Salary Curve. Blandford also takes issue with ExxonMobil's decision to base the TM Salary Curve on the Mercer survey data, but for reasons discussed above, the evidence supports a conclusion that this decision was reasonably informed and considered. Blandford has failed to establish grounds for reversing the district court's decision with respect to his disparate impact claim.

IV.

Blandford argues in his reply brief that the district court erred in applying the *McDonnell Douglas* burden-shifting framework to his THRA claims. Reply Br. 14-19. Blandford points to the

No. 10-5795
*Blandford v. Exxon Mobil Corp.*

Tennessee Supreme Court's decision in *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777 (Tenn. 2010), which held that the *McDonnell Douglas* framework was inapplicable at the summary judgment stage because it conflicted with the Tennessee Rules of Civil Procedure. Blandford failed to raise this argument in his opening brief, which was filed after the *Gossett* decision was issued. This court has consistently held that arguments raised for the first time in a reply brief are waived. *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010).

V.

For the reasons set forth above, we affirm the district court's grant of summary judgment.