**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0887n.06

**No. 10-2318**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Aug 13, 2012*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| AMY MACDONALD-BASS, | ) | |
| | ) | ON APPEAL FROM THE |
| **Plaintiff - Appellant,** | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| J.E. JOHNSON CONTRACTING, | ) | OPINION |
| INC., | ) | |
| | ) | |
| **Defendant - Appellee.** | | |

Before:  McKEAGUE and WHITE, Circuit Judges; BARRETT, District Judge.[*]

**PER CURIAM.**  Plaintiff-Appellant Amy MacDonald-Bass timely appeals the district court order granting summary judgment to her former employer, Defendant-Appellee J.E. Johnson Contracting, Inc.  MacDonald-Bass alleges that JEJ terminated her on account of her sex and in retaliation for filing a worker's compensation claim.  We **AFFIRM**.

**I.**

Neither party disputes the facts as set forth in the district court's opinion, *MacDonald-Bass v. JE Johnson Contr., Inc.*, 2010 U.S. Dist. LEXIS 75961 (E.D. Mich. July 28, 2010), so we reprint them in full:

> Plaintiff is female, approximately thirty-seven years old, 5' 1" tall, and weighs 125 pounds.  Defendant is a full service mechanical contractor providing process piping, plumbing, and heating, ventilating, and air conditioning

---

[*]The Honorable Michael R. Barrett, United States District Judge for the Southern District of Ohio, sitting by designation.

('HVAC') services. In October 2006, Jim Bass, an employee of Defendant, asked his supervisor, mechanical and general superintendent Ray Johnson, to consider hiring Plaintiff. During his interview with Plaintiff, Johnson expressed concern about Plaintiff's ability to physically lift the weight of the pipe and plumbing products. Plaintiff indicated that she did not want any special treatment and stated that she could repeatedly lift 50 pounds or more. Ultimately, Johnson 'agreed to give the Plaintiff the same opportunity to work at J.E. Johnson as everyone else despite her small physical size and lack of experience.' When Plaintiff was hired on October 23, 2006, she was the only female employee in the pipefitting department.

Plaintiff began employment as a 'helper' at a pay rate of $ 8.50 per hour for forty hours a week. Her job required her to 'safely perform assigned tasks related to the layout and installation of the various system related to commercial, industrial and institutional systems.' Assigned tasks included, but were not limited to, lifting heavy pipes, retrieving parts, cutting, grinding, beveling a variety of pipings and fittings, painting the back room ceilings, and the overall cleanup of the shop area. Plaintiff was required to be able to meet certain physical requirements, including: (1) the ability to stand for prolonged periods of time; (2) the ability to stand and walk throughout project sites and machine shop; (3) a full range of body movements including use of hands to finger, handle, or feel objects, computer equipment and peripherals; (4) the ability to bend, stoop, and crouch; (5) the ability to climb stairs and ladders; (6) the ability to operate a motor vehicle; (7) a command of the senses of sight, hearing and touch; and (8) the ability to lift up to fifty pound loads.

In February 2007, Plaintiff received a sixty to ninety day performance evaluation. Her supervisors noted that her skill level matched her wages, and that the 'ABC Wheels of Learning' program would help improve her skills. On March 12, 2007, Plaintiff received a $ 1.50 per hour wage increase. The wage increase form, signed by Plaintiff's supervisor, David Shenkel, noted that Plaintiff was a 'fast learner' and 'has self motivation to become better in the field.'

Plaintiff's first full performance evaluation was conducted on March 29, 2007, and signed by Shenkel. Plaintiff's overall performance rating was 82.63%, *id*., which Johnson confirmed was an 'acceptable' rating. This evaluation noted that Plaintiff was a 'good worker' and 'listen's (sic) well to instruction'; however, she needed improvement in areas including 'ISO orientation,' 'hands on fitting skills,' 'spec reading,' and 'testing.'

In April 2007, Plaintiff had a meeting with Johnson and Schenkel, and was offered a position as a pipefitter. During this meeting, Plaintiff was told that Greg Younk, Defendant's Vice President and General Manager, wanted Plaintiff to be the fitter 'up front' in the shop area. Schenkel told Plaintiff that Younk had said 'why hire someone when we have somebody capable of doing it.' Schenkel told Plaintiff that he did not want her to do the job, that he thought it was 'ridiculous.' Yet, Plaintiff testified that during this meeting, no one expressed any concern about her physical ability to do the job, read isometric drawings, or perform other fitter functions.

In approximately May 2007, after Plaintiff had finished two semesters at the 'ABC' academy, Plaintiff's job classification changed from helper to apprentice pipe fitter one. As a pipe fitter one, Plaintiff had to perform the same basic functions and the same physical demands as for the helper position. She was also required to find fittings for the journeymen, measure and prep welds, and fit up welds.

Plaintiff asserts that she was not given the hands-on work needed to learn the trade. After about three months, Plaintiff approached Younk about the issue. Plaintiff testified that he said, 'I was afraid this was going to happen.' Younk and Plaintiff then spoke with Johnson and Steven Marker, Operations Manager. Johnson told Marker that he did not know why Plaintiff was not being allowed to fit. Marker said that he would look into the situation, but Plaintiff contends that nothing happened. Every two or three weeks, Plaintiff raised the issue with Johnson and he told her that it was not his responsibility.

On August 1, 2007, Plaintiff received a $ 1.85 per hour wage increase. Johnson recommended Plaintiff for the wage increase. On the wage increase form, Johnson noted that Plaintiff was a 'Level 1 fitter' and 'is a good worker who wants to learn.' Johnson testified that Defendant placed Plaintiff with a mentor, journeyman Kevin Roberson, to see if he could assist her in improving her performance. Johnson testified that Plaintiff seemed unable to retain the information provided by Roberson and Plaintiff continued to have performance problems identifying specific fittings and interpreting ISO drawings as well as lifting the bigger bore piping. Johnson discussed these concerns with Plaintiff.

Defendant again praised Plaintiff in her September 2007 evaluation, but noted that Plaintiff needed to improve in certain areas, including "tracing," "testing," "flame cutting," "specs & P&ID's," "ISO reading," and "layout." The evaluation noted that Plaintiff had improved in "reading ISO's" and "layout." The evaluation notes that Plaintiff "would like more opportunity

to get out of the back room" and "wants to learn more fitting skills." Plaintiff asserts that male employees, such as Jake Rowley, were permitted to perform pipefitting duties, advancing past Plaintiff in their skills because they were permitted to obtain hands-on experience.

Defendant emphasizes that the job took a physical toll on Plaintiff and highlights the following medical evidence:

> 08/14/2007 . . . Right-sided shoulder pain . . . chronic right shoulder pain over the past half year or so if not prior to that . . . As a whole, I suspect this is more of an overuse injury rather than any specific trauma. She denies any specific injuries or accidents. She has a lot of problems with her right shoulder specifically with any abduction and adduction . . . A lot of specific things that aggravate her including grinding, etc. . . .
>
> 05/30/2007 . . . Right shoulder pain . . . this has been going on for some time, probably a few months . . . the past several weeks it has been worsening . . . She notices taking off her shirt or lifting the right arm hurts. She did have one episode of numbness in all the fingers of her right hand about 1 week ago . . . She has not had any specific injury . . . She notes she is often having to put large pipes on that shoulder . . .
>
> 01/30/2007 . . . Upper back pain . . . denies any specific trauma . . . doing a lot of very heavy lifting . . . she knew that it would cause some irritation and that she has had similar problems in the past . . . left upper shoulder and lower cervical spine . . . have been tender today and the last 3 or 4 days the right side has been exquisitely tender . . . fiance has been massaging it . . . she does have some trigger point muscle spasms, right greater than left . . .

On January 30, 2008, Plaintiff informed safety director Laraway that she was having "cramping in [her] right shoulder, [and] pain on the right side of [her] neck." Plaintiff also complained of "headaches" that made "[her] eyes hurt" and her "fingers tingle on [her] right hand when [her] shoulder is hurting." Plaintiff told Laraway that her arm and shoulder pain was limiting her ability to fully raise her arm.

When Laraway asked Plaintiff how long the pain had been bothering her, she replied about a month, but it had become worse in the last couple weeks. Plaintiff then explained that the pain was so bad on January 22, 2008 that she was forced to leave work early. She also stated that she was unable to work on January 23, 2008, since she could not get out of bed due to the muscle spasms she was having up her back and over her neck. Plaintiff also mentioned that she had been treated for the same problem approximately two months earlier. After hearing Plaintiff's complaints, Laraway sent Plaintiff to Urgent Care in Midland for care. Plaintiff was diagnosed with tendonitis and cervical strain. The doctor imposed restrictions of no lifting, pushing, or pulling greater than five pounds.

As a result of her restrictions, Defendant placed Plaintiff off work on January 30, 2008. Defendant provided Plaintiff an employee's report of claim for worker's compensation benefits. This was the third time that Defendant had done so. On January 31, 2008, Defendant prepared an employer's basic report of injury for Plaintiff. Defendant's insurance carrier authorized Plaintiff to receive medical treatment and medications.

While Plaintiff was on leave, on February 21, 2008, she was given a $ 1.00 per hour wage increase. On the wage increase form, it was noted that Plaintiff had a "good desire to learn the trade." On March 24, 2008, Defendant evaluated Plaintiff's job performance as a pipe fitter one for the time period of September 1, 2007 through March 1, 2008. Plaintiff's overall rating was 80.33%. It was noted that Plaintiff continued to have problems with "ISO reading/orientation," "layout/mathematics," "specs and P& ID's," "threaded piping/lined piping/takeoff," "material identification & count," and "teamwork."

In May 2008, Plaintiff was cleared to return to work without restrictions. Defendant asserts, however, that it had little work and was in the process of reducing the workforce, and that on May 19, 2008, it laid Plaintiff off. Other male pipefitters were also laid off including Richard Libera, Austin Hammond, and Nick Witzke.

In June 2008, Johnson informed her that she would not be called back from lay off "due to her inability to perform her necessary job duties." At a meeting with Plaintiff and Keri Prybynski, a human resources representative, Johnson told Plaintiff that her employment was being terminated because she did not meet the physical requirements of the job. Plaintiff testified that Johnson threw up his hands and said, "you're going to get hurt, Amy, in this job."

Johnson contends that it initially appeared that Plaintiff "was a good entry level worker who wanted to learn." Then, "even after Plaintiff took the ABC training, it became apparent that Plaintiff needed assistance and improvement in isometric diagrams (three dimensional drawings), reading orientation, lay/mathematics, sec's P&ID's, handling piping and materials, threaded piping/lined, piping take off, material identification & count, team work and to focus on her job and now what others around her were doing." At some point, Plaintiff was enrolled in an eight week enhancement program to try to help her with being able to read and properly implement isometric drawings used in the pipe fabrication process. The enhancement program instructor told Plaintiff, "I have to be honest with you. This is way over your head." Plaintiff agreed.

Johnson maintains that his decision to terminate Plaintiff's employment:

> took into account Plaintiff's coworkers [sic] concerns about Plaintiff's inadequate work performance and their concerns that she was not able to properly perform the job. This included them describing Plaintiff as a "bottleneck" and "stumbling block" in the pipe fabrication process at JEJ. They informed me that Plaintiff's co-workers repeatedly had to step in and do her job for her which took them away from their jobs. My observation of Plaintiff was that she had serious short comings in performing the pipe fitter job.

Johnson specifically identified Kevin Roberson and Kirk Shankel as having described Plaintiff as a bottleneck. They also "reported that other coworkers had to do a lot of the lifting of heavy pipe materials for Plaintiff and they found it necessary to show her how to put the materials together before they could do their welding jobs." Johnson stated that "[w]hen Plaintiff was supposed to be helping her coworkers, including the welders, with preparing piping for assembly and welding, she would complain about her job including, but not limited to, that the grinder hurt her hand, that she could not carry heavy materials."

Plaintiff testified that she had a coworker, Quincy, do the heavy lifting of pipes because "he was so much stronger than me to do that," but also because he "didn't like cleaning parts" or "running the grinder." Defendant also advances the affidavit of Melissa Mantooth, a female pipefitter-welder who was assigned to Defendant by an employment agency from about August 13, 2007 to December 14, 2007, describing a time when Plaintiff used the wrong type of piping, resulting in the loss of time and other resources. Mantooth

states that "[t]his as [sic] not a one time occurrence." She further states that "although the Plaintiff was permitted to attempt different job tasks, she did not have the ability to do the heavy lifting or work at the same speed or do the same job tasks that the other workers in the pipe fabrication shop did."

At some point, safety director Bob Laraway expressed concern to Johnson regarding Plaintiff's "physical ability to perform her job and recommended a reevaluation of whether or not she could safely work as a pipe fitter or helper within the job description." Similarly, Younk testified that Dan Ratell, the Human Resources Manager, expressed concern as to whether Plaintiff "could physically do the job or not."

On February 27, 2009, Defendant sent Plaintiff a letter containing an unconditional offer to return to work at Defendant as a pipefitter. Plaintiff did not accept the offer. As of March 3, 2009, Plaintiff admitted that her shoulder pain "never really improved," that she was laid off from work on June 17, 2009 due to not meeting physical requirements and that she could not physically work as a pipefitter. On July 1, 2009, Plaintiff had right shoulder surgery. Plaintiff asserts that after her surgery, she could have physically performed pipefitter job duties as of January 2010.

**II**.

MacDonald-Bass claims that JEJ treated her differently than similarly situated male employees in the terms and conditions of employment, in violation of Title VII and the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"). 42 U.S.C. § 2000e-2; MCLS § 37.2202(1)(a) *et. seq*. Both statutes prohibit employment discrimination based upon a person's sex.[1] MacDonald-Bass does not submit direct evidence of intentional

---

[1]Because Michigan courts evaluate ELCRA claims at the summary judgment stage in the same manner as Title VII, we consider both claims together. *Harrison v. Olde Fin. Corp.*, 225 Mich. App. 601, 609-10 (Mich. Ct. App. 1997); *Lytle v. Malady*, 458 Mich. 153, 173 n.19 (1998) (explaining that Michigan's four-part test is an "adaptation of the United States Supreme Court's *McDonnell Douglas* test"). In any event, MacDonald-Bass has waived them because she raised them for the first time in her motion for reconsideration. *See generally Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) ("We have found issues to be waived when they are raised for the first time in motions for reconsideration.").

discrimination, and thus, both parties analyze this case under the *McDonnell Douglas* burden-shifting paradigm. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *see also Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 390 (6th Cir. 2009) (citation omitted). First, a plaintiff must establish a prima facie case of discrimination. *Risch*, 581 F.3d at 391 (citation omitted). If the plaintiff does so, the burden shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for the adverse employment decision. *Id.* If the defendant offers such evidence, the burden shifts back to the plaintiff to identify evidence from which a reasonable jury could conclude that the proffered reason was mere pretext for discrimination. *Id*.

We review a grant of summary judgment de novo, assessing the evidence, facts, and inferences in the light most favorable to the nonmoving party. *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011) (citation omitted).

## A. Prima Facie Case

To establish a prima facie claim of sex discrimination, MacDonald-Bass must show: "(1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably." *Vincent v. Brewer*, 514 F.3d 489, 494 (6th Cir. 2007); *see also Lytle*, 458 Mich. 153, 173 n.19 (1998) The only dispute here is whether MacDonald-Bass has presented sufficient evidence that similarly situated male employees were treated more favorably or

that she was replaced by a male employee. To be "similarly situated," a plaintiff must show

that the comparable employee is similar in "all of the *relevant* aspects." *Martin v. Toledo*

*Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008) (citation omitted and

emphasis in original). In making this determination, courts assess certain factors, such as

whether the comparable employees:

> have dealt with the same supervisor, have been subject to the same standards
> and have engaged in the same conduct without such differentiating or
> mitigating circumstances that would distinguish their conduct or the
> employer's treatment of them for it.

*Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 729 (6th Cir. 2004) (citation omitted).

MacDonald-Bass contends that Duane Praither and Jake Rowley are similarly situated

male employees who were treated more favorably. The district court found that neither

Praither nor Rowley were similarly situated. We agree. Although both MacDonald-Bass and

Praither suffered a work-related injury and were placed on medical leave, Praither has not

attempted to return to work nor is there evidence he has been cleared to return. He is

therefore not a similarly situated employee.

The district court's determination that Rowley is not similarly situated is also correct.

Although MacDonald-Bass emphasizes that she and Rowley were both hired as entry-level

helpers, Rowley had relevant prior experience as a welder, machinist, and fabricator that

MacDonald-Bass did not. Contrary to the dissent's assertion that "the record contains no

evidence that experience in welding is relevant to the skills necessary to progress as a pipe

fitter," the record establishes that the role of the pipe fitters is to prepare the pipes for the

welders and work alongside the welders. Welding experience is therefore directly relevant

9

to the duties of a pipe fitter and is undoubtedly a relevant "differentiating or mitigating" circumstance that distinguishes him from MacDonald-Bass. Accordingly, MacDonald-Bass has not established a prima facie case of sex discrimination.[2]

## B. Pretext

Even assuming MacDonald-Bass could establish a prima facie case, she must also demonstrate pretext since JEJ's reasons for her dismissal—physical inability and job performance—are legitimate and nondiscriminatory. A plaintiff may establish pretext by showing that the defendant's proffered reason: (1) has no basis in fact; (2) did not actually motivate plaintiff's termination; or (3) was insufficient to warrant plaintiff's termination. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). "Poor performance is a legitimate non-discriminatory reason for terminating an employee." *Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 802 (6th Cir. 2007) (citation omitted). To avoid summary judgment, "a plaintiff must produce sufficient evidence from which a jury could reasonably reject the defendant's explanation of why it fired her." *Chen*, 580 F.3d at 400.

The district court found that MacDonald-Bass had not demonstrated pretext. Again, we agree. JEJ asserts it terminated MacDonald-Bass because of poor job performance and, relatedly, her physical inability to do the job. When asked why Johnson did not bring MacDonald-Bass back to work, Johnson explained:

---

[2]MacDonald-Bass also argues that she was replaced by a male employee. But the record does not support her assertion, and her statistics argument is also meritless. *See Grano v. Dep't of City of Columbus*, 637 F.2d 1073, 1078 (6th Cir. 1980) (discounting statistical evidence when no additional evidence involving relevant labor market).

> Because I didn't feel she was learning the trade, she was having issues with physical capabilities working with the bigger bore pipe and stuff, which at the time we was [sic] doing a lot of, and I just felt it was in her better interest, and mine.

The record compels the conclusion that Johnson had an honest belief that MacDonald-Bass had difficulties on the job, particularly the demanding physical requirements. *See Chen*, 580 F.3d at 401 ("[W]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless.") (citation and quotation marks omitted). Johnson testified about specific conversations he had with Schenkel involving MacDonald-Bass's physical limitations. Younk also testified that he and Johnson discussed MacDonald-Bass's physical ability to do the job. Johnson testified that he received reports from other employees that MacDonald-Bass was having a difficult time with the job, and all of the employee affidavits – by Roberson, Kirk Schenkel, and Mantooth – corroborate this.

In the face of this evidence, MacDonald-Bass advances three arguments. First, she contends that none of her contemporaneous employment records reveal any concerns with her job performance or physical ability to perform the job duties. The record tells a different story, however. Each of the employment evaluations lists performance areas in which MacDonald-Bass needed improvement, and she readily admitted that a classroom course was way over her head. And MacDonald-Bass's history of shoulder problems further undercuts her argument. Beginning in January 2007, mere months after she began working at JEJ, MacDonald-Bass began experiencing right shoulder problems, culminating with a diagnosis

11

of tendinitis and cervical strain in January 2008 that forced her to take five months away from work. After she was placed on restrictions limiting her to lifting no more than five pounds, the safety director circulated a memo stating that MacDonald-Bass's "health/safety issues . . . raise serious concerns as to her physical abilities to perform the current duties she has been assigned." MacDonald-Bass's physical injuries and the contemporaneous medical reports provide strong support that Johnson honestly doubted her physical ability to do the job.

Second, MacDonald-Bass contends that JEJ's stated reason for terminating her has shifted, providing evidence of discrimination. For this, MacDonald-Bass relies heavily on *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 587 (6th Cir. 2002), in which we explained that "shifting justifications over time calls the credibility of those justifications into question." *Id.* at 592. MacDonald-Bass's argument is misplaced. Unlike here, the initial reason management gave for firing the plaintiff in *Cicero* was categorically different from the reason proffered during litigation. But both this Circuit and others have recognized that providing *additional* non-discriminatory reasons that do not conflict with the one stated at time of discharge does not constitute shifting justifications. *Alexander v. Ohio State Univ. Coll. of Soc. Work*, 429 F. App'x 481, 489-90 (6th Cir. 2011) cert. denied, 132 S. Ct. 528 (U.S. 2011) (applying *Cicero*). *See also Tidwell v. Carter Products*, 135 F.3d 1422, 1428 (11th Cir. 1998) ("the existence of a possible additional non-discriminatory basis for Tidwell's termination does not, however, prove pretext."); *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir. 1996) ("the reasons given by Schindler are not

12

incompatible, and therefore not properly described as 'shifting reasons.'"). Here, JEJ's initial reason has remained the same, albeit expanded, throughout this litigation: JEJ *continues* to emphasize MacDonald-Bass's physical ability as a large part of the reason it terminated her. It also points to the related issue of her performance struggles, which were partly a result of her physical shortcomings and partly a result of her difficulty in retaining the material. We agree with the district court that MacDonald-Bass's performance issues are substantially interrelated with her physical abilities and that JEJ's reasons have not shifted.

Third, MacDonald-Bass's strongest argument, is that she repeatedly complained she was not receiving hands-on pipefitting experience while other male employees around her were. Such hands-on experience, Johnson explained, is necessary to progress as a pipe fitter. Thus, MacDonald-Bass says, JEJ put her into a catch-22 situation, in which she was expected to advance in her skills but was not given the necessary hands-on training to do so.

This argument is not without logical force. But the evidence shows that JEJ attempted to assist MacDonald-Bass in various ways, including pairing her with an experienced journeyman to help overcome her deficiencies. MacDonald-Bass also admitted that she did in fact have responsibilities that included retrieving, cleaning, measuring, cutting, and preparing the fittings for the welders based on isometric drawings. Since the description of the pipe fitter at JEJ is to prepare the pipe for welding, the specific "hands-on" experience she claims to have been denied remains unspecified. MacDonald-Bass has also not clarified whether she believes she was denied hands-on *training* or the opportunity for hands-on *experience*, but instead treats the two concepts interchangeably. In either event,

13

the record shows that JEJ provided her with specific classes, direct pairing with a journeyman, reviews that identified the areas she needed to improve, and a shop environment where she can develop her skills at her own pace. That others with prior related experience advanced faster in this environment is not a showing of discrimination. Additionally, Johnson both hired and fired MacDonald-Bass, providing further evidence that his decision to fire her was not discriminatory. *See generally Wexler v. White's Fine Furniture*, 317 F.3d 564, 573 (6th Cir. 2003) (discussing same-actor inference).

MacDonald-Bass has failed to raise a material factual dispute about whether Johnson honestly, reasonably believed she could not physically perform the duties of a pipe fitter. She therefore fails to demonstrate pretext, and her sex discrimination claim fails.

### III.

MacDonald-Bass also claims that JEJ unlawfully retaliated against her because she filed a worker's compensation claim. The Michigan Workers' Disability Compensation Act ("WDCA"), MCL § 418.101 *et seq*, provides that an employer "shall not discharge an employee or in any manner discriminate against an employee . . . because of the exercise by the employee . . . of a right afforded by this act." MCL § 418.301(11). A prima facie claim of retaliation under the WDCA has four elements a plaintiff must show: (1) plaintiff asserted her worker's compensation rights; (2) defendant laid off or failed to recall plaintiff; (3) defendant's stated reason for its actions was a pretext, and (4) defendant's true reasons for its actions were in retaliation for plaintiff's having filed a worker's compensation claim. *Chiles v. Machine Shop, Inc.*, 238 Mich. App. 462, 469 (Mich. Ct. App. 1999); *Bush v.*

No. 10-2318, *MacDonald-Bass v. JE Johnson Contracting, Inc.*

*Peninsular Realty*, 2011 Mich. App. LEXIS 2179, at *3 (Mich. Ct. App. Dec. 13, 2011). The plaintiff bears the burden of demonstrating a "causal connection between the protected activity, i.e., the filing of his worker's compensation claim, and the adverse employment action." *Chiles*, 238 Mich. App. at 470. The filing of the worker's compensation claim must also be a "significant factor" in the employer's decision to discharge the plaintiff. *Taylor v. General Motors Corp*, 826 F2d 452, 456 (6th Cir. 1987) (citation omitted); *Truthan v. Butterworth Health Corp.*, 1999 Mich. App. LEXIS 2205, at *7 (Mich. Ct. App. Dec. 17, 1999).

The key issue is whether MacDonald-Bass can show a causal connection between being fired and filing her claim. MacDonald-Bass contends that she was medically cleared to return to work, but less than a month later, she was terminated. This temporal proximity, coupled with Johnson's statement that she was going to be hurt, establishes a causal connection, according to MacDonald-Bass. But Michigan law is clear that a temporal connection, without more, is insufficient to demonstrate a causal connection. *See West v. GMC*, 469 Mich. 177, 186 (2003) ("[A] temporal relationship, standing alone, does not demonstrate a causal connection between the protected activity and any adverse employment action"); *cf. Garg v. Macomb County Community Mental Health Serv.*, 472 Mich. 263, 696 N.W.2d 646, 660 (Mich. 2005) (citing *West*). Although in some cases a very close temporal relationship may be sufficient evidence of causation, *West* holds that generally, "[s]omething more than a temporal connection between protected conduct and an adverse employment action is required to show causation where discrimination-based retaliation is claimed." *Id.*

15

The only additional evidence upon which MacDonald-Bass relies, apart from temporal proximity, is Johnson's statement that she was going to get hurt. At best, the statement demonstrates that Johnson was concerned about MacDonald-Bass getting hurt in the future and in no way indicates that the worker's compensation claim played a significant role in Johnson's decision to fire her.[3] MacDonald-Bass overlooks that she filed two previous worker's compensation claims with no adverse consequences, and she cites no evidence that anyone at JEJ objected to or tried to interfere with her medical leave or benefits for the third claim. *Hephner v. M&S Mfg. Co.*, 2005 Mich. App. LEXIS 3124, at *5 (Mich. Ct. App. Dec. 13, 2005).

MacDonald-Bass relies on *Stephens v. Neighborhood Serv. Org.*, 2008 U.S. Dist. LEXIS 63279 (E.D. Mich. Aug. 19, 2008) to suggest that temporal proximity "tends to indicate" that temporal proximity alone is enough to establish causation. Despite the single statement on which MacDonald-Bass relies, *Stephens*, in fact, accords with *West*. In *Stephens*, the plaintiff presented evidence in addition to temporal proximity, including evidence that cutbacks were not necessary when the plaintiff was fired and that upper management inquired into the cost of the worker's compensation benefits. *Id.* at *20-21. As in *West*, MacDonald-Bass has not "shown any reaction or conduct of [her] supervisors that

[3]Although JEJ contends that MacDonald-Bass's retaliatory discharge claim is foreclosed because it is based on anticipation of filing a worker's compensation claim, JEJ is mistaken. The cases on which JEJ relies are limited to situations in which a person has not already filed a claim or otherwise asserted rights under the WDCA. *Lamoria v. Health Care & Ret. Corp.*, 584 N.W.2d 589, 600-01 (Mich. Ct. App. 1998), *vacated and reinstated in pertinent part at* 233 Mich. App. 560 (1999); *Howe v. World Stone & Tile & Rob Straky*, 2008 Mich. App. LEXIS 1165, at *7 n.7 (Mich. Ct. App. June 3, 2008).

reasonably suggests that they were upset by the fact that" she filed a worker's compensation claim, 469 Mich. at 187, nor has she shown that filing the claim was a significant factor in Johnson's decision to terminate her.

In our view, MacDonald-Bass has failed to present evidence to allow a reasonable jury to find a causal connection. Accordingly, she fails to state a claim under the WDCA, and even if she did, our earlier holding that she failed to demonstrate pretext applies with equal force to her retaliation claim.

**IV.**

For these reasons, we **AFFIRM** the district court's grant of summary judgment.

No. 10-2318, *MacDonald-Bass v. JE Johnson Contracting, Inc.*

**HELENE N. WHITE, Circuit Judge**, concurring in part and dissenting in part. I concur in the majority opinion with respect to MacDonald-Bass's worker's compensation claim. Although this is a close case, I respectfully dissent from the majority's conclusion that her sex discrimination claim fails. Because I conclude that MacDonald-Bass has established a prima facie case of sex discrimination and sufficient evidence of pretext, I would reverse the district court's grant of summary judgment.

The district court found that Rowley was not similarly situated for two reasons – he had no "documented performance problems" and he had prior relevant work experience. *MacDonald-Bass*, 2010 U.S. Dist. LEXIS 75961, at *25. But any documented performance issues go to whether JEJ's decision to terminate MacDonald-Bass was legitimate and nondiscriminatory, and Rowley's experience was in welding, not pipe fitting.

This court has "cautioned against improperly considering the employer's proffered reason for termination as a 'predicate for finding [the plaintiff] to have failed to make a prima facie case.'" *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 587 (6th Cir. 2002); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003) (en banc) ("[A] court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case."). By relying on MacDonald-Bass's alleged performance problems in finding Rowley not similarly situated, the district court "improperly conflat[ed] the distinct stages of the *McDonnell Douglas* inquiry." *Cline v. Catholic Diocese*, 206 F.3d 651, 661 (6th Cir. 1999).

18

No. 10-2318, *MacDonald-Bass v. JE Johnson Contracting, Inc.*

The district court's determination that Rowley was not similarly situated because of his work experience is also problematic. Rowley's work experience was in welding, and as Johnson acknowledged, Rowley had "very minimal" experience in pipe fitting. The record contains no evidence that experience in welding is relevant to the skills necessary to progress as a pipe fitter. Pipe fitting, for example, involves interpreting isometric drawings, tracing, testing, understanding specs, layout work, material identification and count, and flame cutting. Nothing in the record, including Rowley's own description of his past work, indicates that he had any experience in these areas. If Rowley's prior welding experience were as relevant to pipe fitting as JEJ now asserts, one may reasonably question why MacDonald-Bass and Rowley would both be hired into the same entry-level position of helper.

We have repeatedly held both that a plaintiff "need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated,'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998); *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 411 (6th Cir. 2008), and that the burden of establishing a prima facie case is not intended to be onerous. *Dunlap v. Tenn. Valley Auth.*, 519 F.3d 626, 630 (6th Cir. 2008); *see also Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1022-1023 (6th Cir. 2000) ("If . . . reasonable minds could differ as to whether a preponderance of the evidence establishes the facts of a [Title VII] prima facie case, then a question of fact does remain, which the trier of fact will be called upon to answer."). In my view, MacDonald-Bass met that burden.

19

MacDonald-Bass also presented evidence from which a reasonable jury could conclude she was treated differently from Rowley. Although MacDonald-Bass was told she could not be considered for pipe-fitting work until she had completed the ABC training program, Rowley was permitted to perform pipe-fitting work before he completed the training. The district court also gave inadequate consideration to MacDonald-Bass's argument that she was never allowed to get the requisite hands-on training to perform adequately. Johnson testified repeatedly that hands-on training was necessary to progress, and MacDonald-Bass presents ample evidence that she was not given this training.

The district court also found that MacDonald-Bass failed to present sufficient evidence of pretext. The district court rejected MacDonald-Bass's contention that JEJ's reason for terminating her had shifted, finding instead that MacDonald-Bass's alleged performance problems and her physical problems were "interrelated." The district court determined that MacDonald-Bass had provided "no evidence to suggest that Defendant terminated her employment based on her gender."

MacDonald-Bass contends that JEJ's stated reason for terminating her has shifted. We have explained that an employer's shifting reasons provide evidence of pretext. *Cicero*, 280 F.3d at 592 ("Shifting justifications over time calls the credibility of those justifications into question."); *see also Clay v. UPS*, 501 F.3d 695, 713 (6th Cir. 2007) (noting defendant's "changing rationale" casts doubt on defendant's stated reason). According to MacDonald-Bass's uncontroverted testimony, Johnson stated she was "going to get hurt" as the reason

he was firing her. Other record evidence corroborates that JEJ's stated reason *at the time Johnson fired her* was her physical inability to do some of the heavy lifting.

Both at the district court and in this appeal, however, JEJ's stated reason is MacDonald-Bass's "poor job performance." Appellee's Br. at 29. Although JEJ maintains that part of the reason for MacDonald-Bass's termination was her physical inability to do the job, JEJ now alleges that MacDonald-Bass needed assistance in reading and interpreting isometric drawings and specs and received the lowest score in an isometric-enhancement course. JEJ attempts to conflate the two reasons, but the emphasis in this litigation on MacDonald-Bass's alleged performance problems reasonably can be seen as an after-the-fact explanation. The only pre-litigation, documented performance problem involved the isometric enhanced-training class MacDonald-Bass admits was over her head. But she had not reached a point in her training to be equipped to succeed in the class, and even after the class, she continued to receive favorable evaluations. Every evaluation MacDonald-Bass received was acceptable or good, including a pay raise and a favorable job performance evaluation a mere three months before she was terminated. When asked about this discrepancy, Johnson responded that she was given the pay raise, "[b]ased on what she could do, yes."

Further, everyone – MacDonald-Bass, Younk, Johnson, and Ratell – acknowledges that MacDonald-Bass expressed her concerns that she was not getting hands-on experience. Although JEJ asserts that it attempted to provide MacDonald-Bass with additional training to assist her progression, MacDonald-Bass testified that when she asked Johnson about why

21

she was not permitted to perform hands-on fitting work, Johnson responded that it was not his responsibility and that she should talk to Dave, her foreman. But Dave had already told MacDonald-Bass that he thought it was "ridiculous" that she would be the pipe fitter up front and that he did not want her to do it. MacDonald-Bass also testified that when she complained to Younk about this, he said he was afraid this was going to happen. The record raises a material factual dispute about whether JEJ's stated reason for terminating MacDonald-Bass is pretextual.

Finally, none of MacDonald-Bass's performance evaluations contained reference to her purported physical inability to perform the duties of the job, and no one ever discussed with MacDonald-Bass her physical capability to do the job. JEJ now points to various affidavits from MacDonald-Bass's coworkers referencing her physical problems. But we are "skeptical of undocumented accounts of employee conduct that may have been created post-termination." *Abdulnour v. Campbell Soup Supply Co.*, LLC, 502 F.3d 496, 502 (6th Cir. 2007). JEJ's reliance on Laraway's memo that he wrote when MacDonald-Bass went on medical leave is misplaced. The memo was written before MacDonald-Bass was cleared to return to work without restrictions. JEJ's unconditional offer to MacDonald-Bass to return to work as a pipe fitter further undercuts its argument that she was incapable of performing the duties of the job.[1]

---

[1]JEJ submitted the letter containing the offer as an exhibit to its motion for summary judgment in the district court and does not raise any issue with Federal Rule of Evidence 408.

Making inferences in the light most favorable to MacDonald-Bass, I conclude she has set forth sufficient evidence from which a reasonable jury could choose to disbelieve JEJ's stated reason. Accordingly, she has demonstrated a material factual dispute about whether JEJ's stated reason for terminating her is pretext for discrimination.

For these reasons, I conclude the district court's summary judgment order should be reversed. I therefore respectfully dissent.