**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0362n.06

No. 15-4189

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Jun 30, 2016
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| TINA DEWALT, | ) | |
| | ) | |
| Plaintiff – Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| HARRISON COUNTY COMMISSIONERS, | ) | |
| | ) | **OPINION** |
| Defendant – Appellee. | ) | |
| | ) | |

**Before: KETHLEDGE, WHITE, and DAVIS,** [*] **Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Tina DeWalt brought this sex-discrimination and retaliation action under Title VII and Ohio Rev. Code Ann. § 4112.02(A) and (I) against her former employer, the Board of Commissioners of Harrison County, Ohio, after the Board abolished her position, full-time dog warden, and hired two males on a part-time basis to replace her. The district court granted the Board's motion for summary judgment, and we AFFIRM.

**I.**

DeWalt's complaint alleged 1) disparate-treatment sex discrimination, i.e., that she was treated differently than male dog wardens in the terms, benefits, and privileges of her employment, 2) that sex discrimination motivated the Board to abolish her position and not rehire her on a part-time basis, and 3) that her position was abolished and she was not rehired in retaliation for her complaints of mistreatment and discrimination.

---

[*]The Honorable Andre M. Davis, Senior Circuit Judge for the United States Court of Appeals for the Fourth Circuit, sitting by designation.

No. 15-4189, *DeWalt v. Harrison County Commissioners*

Following discovery, the district court granted the Board's motion for summary judgment. The district court determined that DeWalt presented insufficient evidence to survive summary judgment on her disparate treatment sex-discrimination claim. Regarding DeWalt's claim that the Board abolished her position and did not rehire her for a part-time position because of her sex, the district court determined that DeWalt presented insufficient evidence of pretext to rebut the legitimate, non-discriminatory reasons the Board advanced to explain its adverse employment actions. Finally, the district court determined that DeWalt did not establish a prima facie retaliation case because, even assuming that she engaged in protected activity, she presented no evidence 1) that two of the three Commissioners at the time were aware of DeWalt's complaints of mistreatment to Pincola, or 2) of a causal connection between her protected activity and the abolishment of her position and failure to rehire her. Alternatively, the district court determined that DeWalt produced no evidence that the Board's purported reasons for its adverse employment actions were a pretext for a retaliatory motive.

**II.**

This court reviews de novo the district court's grant of summary judgment. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008). The district court must construe the evidence and draw all inferences therefrom in the nonmoving party's favor; the issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

2

The facts viewed in the light most favorable to DeWalt are that she began volunteering at the county dog pound in 2007. In 2010, Commissioners Barbara Pincola and Bill Host approached DeWalt about becoming assistant dog warden (for pay) when then-dog warden Christina McMillan took a leave of absence. DeWalt agreed.

Pincola testified that around July or August 2010, DeWalt came to her, frantic, because the radios in her county vehicle were missing and she had filed a report with the Sheriff's Office. The three then-Commissioners, Pincola, Host, and Mike Vinka, met with Sheriff Ron Myers in Myers's office. Also present were Deputies Touville and Jones. Pincola testified:

> [T]he sheriff starts telling us that Tina [DeWalt] had come in and tried to file a report that her radios had been missing and – or were stolen; and I said, yes, I know, she was just over there frantically telling me about it, and how that happened. He goes, "Oh, relax. We took them." I'm going, "What?"
>
> And he goes – and . . . Mike [Vinka] was just dumbfounded, but he didn't say anything. And Bill [Host] is like, "Ha, ha. What a relief." And I'm like, "What?" And they said, "We took them. We have told her she can't leave that car unlocked, and she just leaves it unlocked everywhere she goes." And I said, "**It doesn't lock**." And they said, "Well, we've told her about it, and we took them. And we've got it, and it's okay."
>
> And Bill [Host] was fine with it; and, again, I don't have a good read on how Mike [Vinka] felt about it. But they're like, "So we called you over here to tell . . . you she did this, **and we want her fired today**."
>
> Q  The sheriff said that?
>
> A  Yes. And I said, "Wait a minute" . . . . you're telling me that as a law official of the county you went into . . . a county vehicle – and stole the things, the radios?" And he said, "They're our property." I said, "No. They were in her van, the one that's issued . . . to her."
>
> And Bill [Host] is looking at me like, well, they can do anything they want; and I'm like you're a county official. It was like I was the only one who saw

3

something wrong in what they did, and they were just so proud of themselves that they had gotten in there and done this.

. . . .

So they said, "Well, we're not giving them back to her until she starts locking the vehicle." And we said, "Then we have to get the vehicle fixed so that it can lock." And I don't remember much of the conversation then. I just know I was so mad I couldn't see straight, and it lasted probably 45 minutes to an hour.

And as we were leaving, . . . Deputy Jones came to me and said this: He said, "Barb, **you fire Tina DeWalt today or within 30 days she will be arrested for drug dealing**." And I said, "Is she a drug dealer?" And he said, "She's moving out to this trailer in the middle of nowhere. It would not be hard at all." And I said, "Is she a drug dealer?" And he goes, "**I'm telling you, fire her or she will be.**"

. . . .

Q      And did [Sheriff Myers and Deputy Jones] indicate, other than their staged theft from the county vehicle, that there was any other reason for her termination?

A  No.

PID 245–49 (emphasis added). Pincola testified that Sheriff Myers mentioned no other reason to terminate DeWalt's employment other than the unlocked doors and staged theft of the radios from DeWalt's county vehicle. Neither party sheds light on why Deputies Touville and Jones were present at this meeting or their role, if any, in the sham radio theft.

Pincola testified that when she got back to her office, Sheriff Myers spoke to her again about firing DeWalt, after which she, Commissioner Vinka, Sheriff Myers, Deputy Jones, and then-dog warden McMillan met with DeWalt. The Commissioners told DeWalt that they were going to let her go, in response to which DeWalt "gave the most eloquent and professional answer as to why we should not, that she needed her job, and that she hadn't done that [presumably, what Sheriff Myers accused her of]." PID 250. Pincola testified that the Board

4

No. 15-4189, *DeWalt v. Harrison County Commissioners*

decided, against Sheriff Myers's wishes, to place DeWalt on a thirty-day "review" period rather than terminate her employment.

When asked whether Sheriff Myers had "ever interjected his opinion with regard to how the commissioners should do their job" on matters other than terminating DeWalt's employment, Pincola responded that the Sheriff "talked to us a lot about how to run the dog pound," and added that "the dog pound is the only [department] that . . . works directly for the commissioners." PID 251-52. Pincola further testified:

> Q  Other than running the dog pound . . . it's my understanding that the Harrison County commissioners, as the people in charge of the distribution and the budget for the general fund, have many other employees other than the dog pound and their employees, correct?
>
> A  Yes, yes.
>
> Q  And the sheriff is not one of those, correct?
>
> A  Right.
>
> Q  Okay.  So there are other employees . . . and departments that the Harrison County commissioners oversee, correct?
>
> A  Right.
>
> Q  So my question is:  Did the sheriff ever attempt to interject himself into any other decision with regard to any of those other entities . . . or employees during your tenure . . . as a Harrison County Commissioner?
>
> A  No.

PID 251–52.

At the time Sheriff Myers removed the radio from DeWalt's vehicle, the vehicle was in a state of disrepair to the point that the doors would not lock.  At various times, DeWalt had

requested that the county vehicle assigned to her be repaired and serviced, but her requests were refused.[1]

## 2011 – Commissioner Bethel takes office and Board Appoints DeWalt Dog Warden

Commissioner Don Bethel took office effective January 1, 2011. After the Board fired McMillan, DeWalt became interim dog warden and subsequently, in April 2011, was appointed full-time dog warden by a two-to-one vote, with Pincola and Host voting for the appointment and Bethel voting against it. The Board set DeWalt's salary at $26,000 a year; she was no longer paid on an hourly basis.

As full-time dog warden, DeWalt worked thirty-four regular hours per week but was on call 24/7 and had one part-time support employee who worked ten to fifteen hours a week. DeWalt testified that because the only physical protection she had for catching dogs was a catch-pole, she called the Sheriff several times for back-up, and that the Sheriff's Office usually responded by saying, "[W]e don't have anybody in the area[,] and you're the dog warden" or by stating that it was not their job to assist her. PID 112. DeWalt requested firearms training, a Taser, or some other form of protection for use while in the field catching dogs. Ohio Rev. Code Ann. § 955.12 provides that dog wardens "shall have the same police powers as are conferred upon sheriffs and police officers." However, Commissioners Bethel and Host believed such firearm training was unnecessary, and Sheriff Myers refused to provide such training when Pincola requested it for DeWalt.

---

[1] DeWalt testified that the County Garage, then run by Dale Norris, began refusing to service the dog warden truck during the tenure of former dog warden Christina McMillan, DeWalt's immediate predecessor and former boss. DeWalt also testified that she had to use her personal vehicle when the dog warden truck was in the shop for a week because there was no backup vehicle available to her. DeWalt testified that the Commissioners told her they could not understand why the County Garage would not work on the warden vehicle but did nothing about it, and DeWalt had to call and make arrangements at local garages to get the vehicle serviced.

Pincola testified that although she never heard Sheriff Myers refer directly to DeWalt's gender, the Sheriff once told her, "you fired your good one," referring to former dog warden Carl Stewart, a male. PID 253. Pincola summed up that DeWalt "was in the middle of a hate group" that included Commissioners Bethel and Host, along with Sheriff Myers and a Deputy.

**August 2011**

Around August 2011, Commissioners Bethel and Host began receiving numerous complaints about DeWalt. Pincola acknowledged receiving complaints about DeWalt and that there was controversy and negative publicity while DeWalt was dog warden, but she explained that complaints are the norm with dog wardens, not just DeWalt.

When Pincola received such complaints about DeWalt, she would get DeWalt's side of the story and then talk to Sheriff Myers and a prosecutor. According to Pincola, the complaints were "a nonissue as soon as I had gotten all that information." PID 271. Pincola testified that, in contrast, when her fellow Commissioners would discuss complaints about DeWalt, Pincola would ask them whether they had asked DeWalt her side and they invariably responded that they had not.

**March 2012 – Pincola Loses Primary Election to Dale Norris**

Pincola lost the March 2012 primary election to Dale Norris, a retired County Highway Superintendent who, while in charge of the County Garage, had refused to perform repairs on DeWalt's county vehicle.

**December 2012**

Unbeknownst to Pincola, while she still held office in late December 2012, Commissioner Bethel met with John Birney, retired Park Manager of Tappan Lake Park, and inquired whether Birney was interested in the dog warden position. Birney testified that he explained to Bethel that because he recently had retired, he was interested in working only two or three days a week, and Bethel responded by saying "he had somebody else in mind that might be willing to work along with" Birney. PID 495, 573.

Similarly unbeknownst to Pincola, Bethel met with Jeff Campbell, former Assistant Water Superintendent for the Village of Cadiz (the county seat of Harrison County), in December 2012 and inquired whether Campbell was interested in a dog warden position. Campbell and Birney had known Bethel for years.

Pincola testified that in December 2012, after DeWalt informed her that messages were left on the dog pound answering machine indicating that there were two new dog wardens coming in, she went to the dog pound and listened to some of those messages, one of which was left by a woman who said, "I'm calling for Jeff, who I heard is the new dog warden, and I just wanted to let you know that we're going to be so helpful to you . . . and we're so excited that they're hiring you." PID 259.

**January 2, 2013**

The day after Pincola left office, Bethel, Host, and Norris voted to abolish the full-time dog warden position. By letter dated January 2, 2013, the Commissioners notified DeWalt:

8

> Dear Ms. DeWalt:
>
> During the January 2 Commissioners meeting, it was decided that effective January 16 we will be abolishing the full-time position of Dog Warden. This position will be replaced with two (2) part-time dog wardens that we believe will better serve the public and relieve the over-bearing [sic] time commitment necessary to effectively do the job.
>
> You are cordially invited to apply for one of these positions, if you have any questions or concerns please contact the Commissioners [sic] Office and we will meet at your convenience.

PID 323.

Twenty-two persons, both men and women, applied for the part-time positions, including DeWalt, Campbell, and Birney. Campbell completed his application on January 8, 2013, before the part-time positions were advertised in the weekly newspaper on January 12, 2013. The Board reviewed the applications but held no interviews. The record is unclear on what date Bethel notified Campbell and Birney that they had been chosen to fill the part-time positions. DeWalt's last day on the job was January 15, 2013, and Campbell and Birney assumed their part-time positions around January 19, 2013.

Birney and Campbell have an office assistant who works twenty to twenty-three hours a week answering phones and cleaning kennels. When Birney and Campbell requested a cell phone and a new truck from the Board they "got no pushback" from the Commissioners.[2] They were provided a paid cell phone soon after they requested it and a new truck five to seven months into their employment.

---

[2] The Commissioners maintain that the County Engineer, not the Board, funds the cell phone assigned to Birney and Campbell. Before becoming a commissioner, Norris was Harrison County Highway Superintendent for thirteen years, a position supervised by County Engineer Rob Sterling. Norris retired from that position in 2010.

The combined annual earnings of Birney and Campbell exceed DeWalt's. DeWalt was paid a *salary* of $500 per week or $26,000 annually and was on call 24/7. Birney and Campbell, on the other hand, are paid $12.75 and $12.50 per *hour* respectively, work around twenty to twenty-two hours per week each, and are alternately on call 24/7. Together, they earn at least $28,236 a year. The Board asserts that DeWalt's salary discrepancy argument does not take into account the amount it paid to insure DeWalt under the Affordable Care Act. Birney and Campbell are required to be certified to carry firearms and are provided mace and a tranquilizer pole as well. The male dog warden that preceded DeWalt, Carl Stewart, also carried a firearm.

### III. Sex Discrimination

We note at the outset that DeWalt did not name Sheriff Myers as a defendant and neither argues nor explains what authority, if any, the Board of Commissioners had over Myers, or how the Board may be liable for Myers's actions, egregious as they were. Further, DeWalt's brief does not challenge the district court's dismissal of her federal and state-law claims that the Board discriminated against her with respect to the terms, conditions, and privileges of her employment based on her sex and has thus waived that claim. *See Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 624 (6th Cir. 2013) (arguments adverted to in perfunctory manner are waived).

Regarding DeWalt's claim that sex discrimination motivated the Board's elimination of her position, the sole issue is whether she presented sufficient evidence of pretext; the Board does not dispute that DeWalt presented a prima facie sex-discrimination case as to the elimination of her position and the failure to rehire her. To establish pretext, DeWalt must produce evidence that the Board's proffered non-discriminatory reasons for abolishing her

position and not rehiring her either 1) had no basis in fact, 2) did not actually motivate the elimination of her position and decision not to rehire her, or 3) were insufficient to warrant the adverse actions. *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009).

**Board's Reasons for Abolishing DeWalt's Position**

In its motion for summary judgment, the Board asserted that it abolished DeWalt's position for the following non-discriminatory reasons: DeWalt's lack of professionalism, performance problems, inability to work with the public and other county officials, and mismanagement of public money.

DeWalt's memorandum in opposition to the motion responded that the Board could not rely on her purported performance deficiencies because those reasons differed from the reasons provided to DeWalt and the media at the time her position was abolished and differed from the reasons the Commissioners testified to on deposition, i.e., the need to improve service at the dog pound, the need to alleviate the stress of the dog warden position on one individual, and budgetary concerns.

The district court concluded that DeWalt showed no real inconsistency in the Board's proffered legitimate reasons. It determined that the Board's consideration of DeWalt's performance deficiencies "falls within the scope of the need expressed in plaintiff's termination letter to take action to 'better serve the public and relieve the over-bearing time commitment necessary to effectively do the job.'" PID 586. The court determined that the goal of reducing expense to the county "is also encompassed within the need to better serve the public," and that the evidence "shows that the need to improve performance and to save the county money were

considered at the outset . . . [as were] the need to fill the position with someone familiar with crisis management, who would not escalate a volatile situation, and who would work well with the sheriff's office."  PID 586-87.

On appeal, DeWalt simply reiterates that the Board cannot rely on reasons different from those advanced at the time her employment was terminated and does not otherwise explain how the district court erred.  On this record, we see no reason to disturb the district court's determination that the legitimate reasons proffered in the Board's motion for summary judgment do not constitute "shifting justifications" because they do not conflict with the reasons stated at the time of discharge.  *See MacDonald-Bass v. J.E. Johnson Contracting, Inc.*, 493 F. App'x 718, 726 (6th Cir. 2012) (unpublished) ("[P]roviding additional non-discriminatory reasons that do not conflict with the one stated at [the] time of discharge does not constitute shifting justifications.").

DeWalt did not establish that the Board's legitimate non-discriminatory reasons had no basis in fact, did not actually motivate, or were insufficient to motivate, the elimination of her position and the decision not to rehire her as a part-time dog warden.

## IV. Retaliation

To establish a prima facie retaliation case under Title VII and Ohio Rev. Code Ann. § 4112.02(I), DeWalt must show that 1) she engaged in protected activity, 2) the Commissioners knew of that activity, 3) she was subjected to an adverse employment action, and 4) a causal connection exists between her protected activity and the adverse employment action.  *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014); *Smith v. Dep't of Pub. Safety*, 997 N.E.2d

597, 614 (Ohio Ct. App. 2013) ("Due to the similarities in Title VII and R.C. Chapter 4112, Ohio courts look to federal case law addressing Title VII for assistance in interpreting R.C. Chapter 4112."). If a plaintiff establishes a prima facie case and the employer articulates a legitimate non-discriminatory reason for its adverse employment action, the burden shifts to the plaintiff to establish pretext. *Ladd*, 552 F.3d at 502.

Like Title VII retaliation, Ohio Rev. Code Ann. § 4112.02(I) "requires the plaintiff to prove that retaliation is the but-for cause of [the] adverse employment action." *Smith*, 997 N.E.2d at 614. Accordingly, DeWalt must present proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful actions of the Commissioners. *See Laster*, 746 F.3d at 731.

Assuming without deciding that DeWalt established a prima facie retaliation case, she has presented no evidence that her position was abolished, or that she was not rehired, in retaliation for complaints of sex discrimination. On deposition, DeWalt was unable to identify specific complaints of discrimination that she had made, but she pointed to Pincola, who was being deposed later that day, as being able to provide that information. However, Pincola no longer held office when the Board abolished DeWalt's full-time position and created two part-time positions, and Pincola testified that she is unaware of the Board's reasons for doing so. Further, as discussed above and as the district court determined, DeWalt failed to rebut the Board's legitimate non-discriminatory reasons for abolishing her position and not rehiring her by showing pretext. *See Ladd*, 552 F.3d at 502. We affirm the district court's dismissal of DeWalt's retaliation claim on that basis.

## V.

For these reasons, we AFFIRM the district court's grant of summary judgment to Defendant Board of Commissioners.